**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

| | | |
|---|---|---|
| JOHN BRANDON LAMOTTE,<br><br>PLAINTIFF,<br><br>V.<br><br>CITY OF FRANKFORT, Frankfort Police Officers CHARLES WASHBURN, SCOTT MORGAN, RANDY CUMMINS, and JOSH BAKER, in their individual capacities; other unknown members of the Frankfort Police Department; Franklin County Commonwealth's Attorney, LARRY CLEVELAND, in his individual capacity, and, FRANKLIN COUNTY,<br><br>DEFENDANTS. | ) | CASE NO.<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

NOW COMES Plaintiff, JOHN BRANDON LAMOTTE, by his attorneys LOEVY & LOEVY, and complaining of Defendants CITY OF FRANKFORT, Frankfort Police Officers CHARLES WASHBURN, SCOTT MORGAN, RANDY CUMMINS, and JOSH BAKER, in their individual capacities; other unknown officers from the Frankfort Police Department; Franklin County Commonwealth's Attorney LARRY CLEVELAND, in his individual capacity, and FRANKLIN COUNTY and states as follows:

## Introduction

1. Plaintiff John "Brandon" Lamotte was just 24 years old when officers from the Frankfort Police Department conspired with each other and with the Commonwealth's Attorney to frame him for the assault of Mary Katherine "Kate" Sanders.

2. On the morning of March 3, 2017, Sanders reported to emergency medical personnel enroute to the hospital that she had been stabbed by her ex-boyfriend, Chase Dugas.

3. Sanders and Dugas had a tumultuous, violent relationship resulting in an assault charge against him and multiple Emergency Protective Orders ("EPO") and/or Domestic Violence Orders ("DVO"), including a petition filed approximately two months before the assault at hand.

4. Lamotte, on the other hand, was known by all as a passive, humble, polite, peacemaker who was named "man of the year" at his church.

5. Nonetheless, the Defendants targeted Lamotte, Sanders' neighbor and friend, for the crime, conspiring to take his liberty and knowingly initiating false charges against him.

6. In so doing, Defendants fabricated evidence and withheld exculpatory evidence pointing to Dugas as the attacker.

7. As a result, in January 2019, Lamotte was wrongfully prosecuted, convicted, and sentenced to eleven (11) years' imprisonment for Assault in the First

Degree, a violent crime making him ineligible for parole consideration until he had served 85% of his sentence.

8. After trial, Sanders again confirmed Dugas was her attacker and repeatedly admitted that she lied at trial, due to the misconduct of the Defendant officers and prosecutor, when she testified Lamotte assaulted her.

9. Tragically, Lamotte spent over 8 years wrongfully convicted and incarcerated, suffering extreme damage to his physical and mental health, before his conviction and charges were finally set aside in November 2025.

10. This manifest injustice was not the result of mere flaws in the judicial system. Rather, the Defendants named herein conspired to take Lamotte's liberty by knowingly initiating false charges against him.

11. Lamotte now brings this lawsuit to enforce the Constitutional right to liberty and due process guaranteed to all citizens.

## Jurisdiction and Venue

12. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the U.S. Constitution.

13. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

14. Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all parties reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

## The Parties

15. Plaintiff John "Brandon" Lamotte is a 33-year-old African American resident of Frankfort, Kentucky.

16. At all relevant times, Defendants Charles Washburn, Scott Morgan, Randy Cummins, and Josh Baker were officers with the Frankfort Police Department. Each of these Defendant Officers is sued in their individual capacities, and each acted under color of law and within the scope of their employment in engaging in the actions alleged in this Complaint.

17. Defendants Washburn, Morgan, Cummins, and Baker are collectively referred to as the "Defendant Officers."

18. Defendant City of Frankfort is a political subdivision of the Commonwealth of Kentucky and is a home-rule class city. Defendant City of Frankfort is responsible for the policies, practices, and customs of the Frankfort Police Department.

19. Defendant City of Frankfort is referred to as the "City Defendant."

20. At all relevant times, Defendant Larry Cleveland was the Franklin County Commonwealth's Attorney. Defendant Cleveland is sued in his individual capacity and acted under color of law and within the scope of his employment in engaging in the actions alleged in this Complaint.

21. Defendant Franklin County is a local government entity organized under Kentucky law. Defendant Franklin County is responsible for the policies, practices, and customs of the Franklin County Commonwealth's Attorney's Office.

22. Defendants Cleveland and Franklin County are collectively referred to as the "County Defendants."

23. The individual defendants are referred to collectively as the "Individual Defendants."

**The Assault of Mary "Kate" Sanders**

24. On the morning of Friday, March 3, 2017, Sanders went outside to smoke a cigarette.

25. Minutes later, Sanders' mother, Tamara Patrick, discovered her lying on the floor with lacerations and puncture wounds.

26. When paramedics arrived at approximately 9:40 am, they found Sanders coherent, conscious, and talking. She was not actively bleeding, and the blood on her was dried.

**Defendants Immediately Learned the Identification of Sanders' Attacker**

27. En route to the hospital, Sanders twice told paramedics that "Chase" caused her injuries.

28. The paramedics relayed that information to the Frankfort Police Department ("FPD") dispatch who included the following on the call detail sheet. Dispatch included Chase's full name and phone number on the sheet:

0954 PER UNIT 21 ONE OF THE DETECTIVES IS ENROUTE
1006 PER UNIT 73 PER THE VICTIM SHE IS ADVISING THAT CHASE IS THE ONE WHO STABBED HER
D11148358
CHASE DUGAS 502-319-2792

29. Thereafter, Defendant Randy Cummins obtained a statement from the paramedics, noting that Sanders named her boyfriend Chase as the perpetrator.

30. FPD officers investigated the assault. Defendant Charles Washburn led the investigation.

31. Instead of following the credible evidence implicating the individual named by the victim, Defendants entered a conspiracy to frame Lamotte for a crime he did not commit.

**Dugas and Sanders Had a Violent History**

32. Chase Dugas, a white male, was a self-proclaimed drug dealer, with a father well-connected in the greater Frankfort area.

33. Dugas and Sanders dated and had a tumultuous, violent relationship resulting in multiple EPOs and DVOs, as well as an assault charge against him.

34. On December 4, 2016, Dugas assaulted Sanders.

35. The following day, and only three months prior to the physical assault at hand, Sanders filed a DVO against Dugas.

36. She subsequently filed a second petition against him, and on December 28, 2016, the Court issued a DVO to remain in effect until December 28, 2019. The Court ordered Dugas to complete counseling.

37. Only two days prior to the March 3, 2017 assault, the Court denied a Motion to Amend the DVO to non-violent contact.

38. The assault charge against Dugas resulted from a December 4, 2016 violent incident in which law enforcement documented that Dugas repeatedly pushed Sanders down, preventing her from breathing by placing a cover over her face and pressing down on it, and verbally abusing her.

39. The assault charge was dismissed the day before the attack at hand because the prosecutor could not locate Sanders.

40. Although aware of Dugas' previous assault of Sanders, that Sanders had obtained an EPO and DVO against him, and that Sanders had named Dugas as her attacker, Defendant Washburn did not inquire about nor investigate the previous acts of violence by Dugas against Sanders.

**Defendants Quickly Learn that Dugas Had Threatened Sanders and Lamotte**

41. On the day of Sanders' assault, Defendant Scott Morgan interviewed Lamotte and learned that Dugas had threatened both Lamotte and Sanders.

42. Lamotte informed Defendant Morgan that he feared for Sanders' safety because Dugas had recently threatened her, her family, and Lamotte.

43. Sanders confirmed at trial that she messaged Lamotte on the day of the assault telling him she needed to speak with him because Dugas was scaring her.

**Defendants Withhold Sanders' Cellphone**

44. Upon information and belief, Defendant Randy Cummins collected Sanders' cellphone on the day of the assault.

45. Defendant Washburn informed Sanders' mother, Tamara Patrick, that he was going to draft a search warrant, take Sanders' cellphone, and look through it.

46. Sanders testified at trial that her cellphone had been missing since the day of the assault.

47. Defendants have never disclosed the phone nor the results of the search of Sanders' cellphone, despite it containing exculpatory information about her tumultuous relationship with Dugas.

**Defendant Washburn Ignores Leads into Potential Suspects**

48. Patrick was transported to the FPD headquarters as Sanders was being transported to the hospital.

49. There, Patrick informed Defendant Charles Washburn about individuals Sanders had recently dated and/or with whom Sanders had recently interacted.

50. In addition to Dugas, those individuals included a white male named Mike, with whom Sanders had gone out on a date the night before the attack. The Defendants conducted no follow-up investigation on Mike and did not pursue him as a suspect.

51. Patrick also informed Washburn that Sanders had recently argued with a black male named Demetrius, who Sanders had recently dated.

52. Defendant Officers later identified Demetrius as Demetrius Moxley, who had pending criminal charges of which the Defendant Officers were aware.

53. The Defendant Officers also learned that Moxley may have dealt drugs and that Sanders may have been attacked for owing drug money.

54. But neither Defendant Washburn nor the other Defendant Officers conducted any further investigation into Moxley.

**Sanders' Mother Names Dugas as the Likely Perpetrator; Washburn Withholds that Information in his Investigative Report**

55. During her initial interview with Defendant Washburn, Patrick told him that she believed Dugas was the perpetrator.

56. When Washburn began pushing that Lamotte was instead responsible, Patrick informed him that Lamotte was not the kind of person who would do such a thing, but Dugas was as he was unstable.

57. Patrick informed Washburn further that Lamotte was a nice guy.

58. Regardless, Defendants still set about to frame Lamotte for a crime he did not commit.

59. To that end, Defendant Washburn omitted in his investigative report that the victim's mother believed Dugas was the perpetrator and that Lamotte was not the type of individual to commit the crime.

**Defendants Learn Dugas Had a Motive for Revenge; Lamotte Did Not**

60. Defendant Josh Baker, a narcotics investigator, questioned Dugas at the FPD headquarters on the day of the assault.

61. When asked about his relationship with Sanders, Dugas provided Baker with a detailed account of their tumultuous relationship and provided Baker with multiple motives for attacking Sanders.

62. Dugas informed Baker that he dealt drugs and that Sanders smoked all his drugs, depriving him of his drug proceeds. According to Dugas, he lost lots of money because of Sanders, bringing him to rock bottom.

63. Dugas was angry that Sanders ruined him and cost him money and told Defendant Baker that Sanders could "rot in hell."

64. Lamotte, on the other hand, had no motive for attacking Sanders.

65. Lamotte had been friends with Sanders for years, saw her almost daily, and came to her aid after one of her previous altercations with Dugas.

**Defendants Assist in Fabricating a Statement and Alibi for Dugas**

66. When speaking with Defendant Baker, Dugas admitted to quickly realizing he needed alibis to account for the time of the assault.

67. In furtherance of the conspiracy to frame Lamotte and exculpate Dugas, Defendant Baker and Dugas fabricated an alibi for Dugas.

68. Dugas said he and some friends went out the night of Thursday, March 2, 2017, got drunk and ultimately passed out at a friend's apartment – an apartment only 10 minutes from Sanders' residence.

69. Defendant Baker requested the names and numbers of the friends who were at the apartment and told Dugas exactly what he needed his friends to tell Baker – that Dugas was with them at the time of the assault.

70. After Defendant Baker and Dugas discussed what the statement needed to include, Dugas wrote a statement of his alleged whereabouts during the time in question, telling Baker he hoped the statement works.

71. At the conclusion of the interview, Defendant Baker gave Dugas another heads up that he was going to call Dugas' friends, and thereafter, gave Dugas days to prepare his friends for the calls.

**Defendant Baker Takes Photos of Injuries on Dugas' Hands and Forearms, and Withholds Them from Lamotte**

72. During his interview with Dugas on the day of the assault, Defendant Baker took photographs of wounds and abrasions on Dugas' arms, torso, and lower spine.

73. While taking the photos, Dugas told Baker, "I promise I don't cut myself," indicating the wounds resembled cuts.

74. Although Dugas responded that he had "no clue" how some of the wounds occurred, Baker provided him with an explanation: that he burned himself at work.

75. Baker did not document in a written report taking Dugas' photographs.

76. To date, Defendants have never disclosed Dugas' photographs to Lamotte, withholding exculpatory evidence pointing to Dugas as the perpetrator.

**Defendant Washburn Participates in the Fabrication of Dugas' Alibi**

77. In their conspiracy to frame Lamotte, sometimes acting alone and sometimes acting in concert, Defendant Washburn manipulated and manufactured statements from witnesses to falsely "confirm" Dugas' fabricated alibi.

78. In so doing, Defendants knew the alibi witnesses could not confirm Dugas' alibi but falsely documented otherwise in investigative reports.

**Defendants Washburn and Morgan Question Sanders at the Hospital, Never Asking Who Assaulted Her**

79. Two days after the assault, Sanders underwent surgery to have a chest tube inserted. As a result, she was anesthetized and post-surgery, was given powerful analgesic drugs, including oxycodone and fentanyl.

80. Just hours after her surgery, Defendants Washburn and Morgan went to the hospital to obtain a statement from Sanders; it was the first time law enforcement questioned her.

81. Sanders could not speak and responded to Defendants' questions by nodding her head or mouthing her responses.

82. Having already determined to frame Lamotte, the Defendant Officers never asked her if Lamotte was her assailant. In fact, they never questioned her about the identity of her assailant at all.

83. Instead, they simply asked if she and Lamotte had been arguing; she shook her head no.

84. Likewise, neither Defendant Washburn nor Defendant Morgan questioned Sanders about the statement she made about "Chase" being her attacker when asked by paramedics immediately after the assault.

85. As part of their quest to frame Plaintiff, neither Defendant questioned Sanders about anyone except Lamotte.

**Defendant Washburn Used Fabricated Evidence to Initiate Charges Against Lamotte**

86. Four days after Sanders identified Chase as her attacker, Defendant Washburn executed a Criminal Complaint for Lamotte, charging him with Assault in the First Degree and alleging he caused serious physical injury to Mary Sanders by means of a deadly weapon.

87. Washburn intentionally withheld information from the charging documents that eviscerated probable cause for Lamotte's arrest, with the intent on misleading the judicial system into approving false charges against Lamotte.

88. For instance, the Criminal Complaint charging Lamotte with Assault in the First degree, a Class B felony carrying 10-20 years, makes no mention of the fact that Sanders named Dugas as the perpetrator.

89. On March 7, 2017, Washburn served Lamotte with the arrest warrant for the assault charge.

90. Defendants, including Commonwealth's Attorney Larry Cleveland, knew Dugas' alibi was false and fabricated, and knew Lamotte was innocent, but used that alibi to avoid charging Dugas and to manufacture charges against Lamotte.

91. As a result of Defendants' conspiracy, fabrication and withholding of exculpatory evidence, a Franklin County jury convicted Lamotte of assault on January 30, 2019. He was sentenced to 11 years' imprisonment.

92. Immediately thereafter, Lamotte filed a Notice of Appeal in the Kentucky Court of Appeals, and the Kentucky Attorney General's Office assumed representation for the Commonwealth.

93. Even after his unlawful arrest and wrongful conviction, Defendants conspired to frame Lamotte for Sanders' assault, depriving him of his freedom without the due process of law.

**Sanders Recants her False Allegations in Writing and Verbally to Multiple Individuals, Including Defendant Cleveland**

94. The Defendants' misconduct did not end when Lamotte was wrongfully arrested and convicted. Indeed, the misconduct continued for many years.

95. Even after the conclusion of Lamotte's criminal trial, evidence of his innocence continued to surface. In response, Defendants persisted for years to ensure Lamotte's conviction would stand for a crime they knew he did not commit – even after Sanders admitted multiple times that Lamotte was innocent.

96. After Lamotte's conviction and prior to the initiation of the post-conviction proceedings in the underlying case, Sanders recanted her perjured trial testimony directly to Defendant Commonwealth's Attorney Cleveland. To date, Cleveland has concealed those recantations.

97. In April 2019, after Lamotte had been convicted and sentenced to prison, Bradley Chambers walked into the FPD headquarters and asked to speak with an officer. Thereafter, Chambers revealed that days earlier Sanders became upset and confided that Lamotte was wrongfully convicted and that it was her ex-boyfriend who assaulted her.

98. Sanders further revealed that Lamotte helped to save her life after the assault.

99. Sanders admitted to Chambers that she lied at trial when she accused Lamotte of attacking her.

100. Sanders appeared remorseful, scared, sober, and ashamed when confessing her false allegations against Lamotte to Chambers.

101. After giving his statement to FPD officers, Chambers received a non-solicited call from Defendant Cleveland. Cleveland, upon hearing about Sanders' recantation and acting outside the scope of any judicial proceeding, told Chambers to ignore what Sanders told him.

102. Despite knowing otherwise, Cleveland reported that what Sanders had written on Facebook and told Chambers and others, regarding Lamotte's innocence and Dugas' guilt, was nonsense.

103. To date, Defendants have not disclosed the identity of the "others" with whom Sanders was communicating regarding Lamotte's innocence or the substance of those communications, including the exculpatory communication Sanders had directly with Cleveland.

104. Likewise, in the Spring of 2019, Sanders told Jeremy Baltz that she had sent the wrong man to prison.

105. Emily Redmon and Sanders have been friends since elementary school. Redmon witnessed Sanders and Dugas fight many times and knew their relationship to be volatile and abusive.

106. On one occasion, Redmon observed Sanders punch Dugas in the face repeatedly while he was driving.

107. In 2018, Sanders came into the place of business where Redmon worked and confided that Dugas was the individual who assaulted her, not Lamotte.

108. On April 14, 2019, Sanders admitted on Facebook that Dugas was her attacker:




109. At an evidentiary hearing held in Franklin Circuit Court in August 2020, Sanders admitted making the post stating Dugas was her assailant and did not deny telling Chambers, Baltz, and Redmon that Lamotte had not attacked her.

110. Even still, Defendants continued in their quest to frame Lamotte and continue his wrongful detention.

**Defendant Cleveland Continues Conspiracy to Frame Lamotte by Creating False Testimony, While Continuing to Withhold Exculpatory Evidence**

111. In April of 2020, approximately one year after Defendant Cleveland learned of further evidence undermining the integrity in Lamotte's conviction, Lamotte filed a post-conviction pleading regarding Sanders' multiple recantations and reasserting his innocence.

112. At an August 2020 evidentiary hearing, Lamotte presented credible testimony from each of the individuals to whom Sanders had recanted as well as evidence that photos taken of Dugas' injuries to his hands and arms had been concealed.

113. By the time of the hearing, Lamotte had been incarcerated for 3.5 years.

114. Despite being told directly by Sanders and by learning from several individuals that Sanders had admitted to sending an innocent man to prison, Defendant Cleveland continued in his and the other Defendants' efforts to frame Lamotte for a crime he did not commit.

115. To continue Lamotte's wrongful detention and while continuing to withhold that Sanders had admitted to him that she lied when saying Lamotte was the perpetrator, Cleveland coached Sanders to provide false testimony at the hearing.

116. Specifically, while continuing to conceal the recantations she had previously made directly to Cleveland, Cleveland coached Sanders to feign no memory of repeatedly recanting her perjured testimony, on multiple occasions, to others.

117. Defendant Cleveland fabricated Sanders' hearing testimony knowing Dugas was responsible for assaulting Sanders, not Lamotte, and while withholding that Sanders had recanted her false trial testimony directly to him.

118. At the time Cleveland committed this misconduct, he was aware that Sanders' statement and testimony implicating Lamotte was false and fabricated.

119. At the time Cleveland committed this misconduct, he was aware that no credible evidence existed implicating Lamotte in Sanders' assault, yet, he participated in fabricating her statement to ensure that Lamotte remained incarcerated.

**The Appellate Court Twice Vindicated Lamotte**

120. On August 4, 2023, the Kentucky Court of Appeals overturned Lamotte's conviction, in a manner indicative of innocence. The Commonwealth requested and was granted rehearing.

121. On March 14, 2025, the Court of Appeals issued a 70-page opinion affirming its original opinion reversing the judgment of conviction. The appellate court ordered the circuit court to enter an order granting judgment notwithstanding the verdict. The Commonwealth sought discretionary review, prolonging Lamotte's continued wrongful detention.

122. After the Kentucky Supreme Court denied the Commonwealth's Motion for Discretionary Review in October 2025, the Franklin Circuit Court finally entered a Judgment Notwithstanding the Verdict on November 18, 2025.

**As Part of the Pre-existing Conspiracy, Defendant Cleveland Opposed all Efforts at Lamotte's Release, Prolonging Lamotte's Wrongful Detention**

123. On August 5, 2023, the day after the Court of Appeals' initial opinion overturning Lamotte's conviction, Lamotte filed a motion for bond. Despite knowing Lamotte's innocence, and as part of the pre-existing conspiracy with the other Defendants, Defendant Cleveland vigorously opposed the motion.

124. Litigation regarding the request for bond on appeal continued for the next two years, with Defendant Cleveland fighting to keep Lamotte falsely imprisoned.

125. On August 1, 2025, the circuit court finally entered an order granting Lamotte's release on bond. When finally released, Lamotte had spent over almost 8 years and 5 months unlawfully incarcerated.

**Lamotte's Damages**

126. Prior to his unlawful arrest and malicious prosecution for a crime he did not commit, Brandon Lamotte was a thriving and vibrant young man, known by others as a peacemaker. He played basketball for Frankfort High School and was nominated as Homecoming King his senior year.

127. Because of Defendants' egregious misconduct, Lamotte was ripped from his home, family, and the community that loved him and sentenced to 11 years' incarceration for a crime he did not commit.

128. Lamotte's arrest and wrongful conviction caused him to lose his future job and career prospects, skills, and income he would have acquired during his wrongful detention and after his release.

129. During his incarceration, Lamotte was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, birthdays, and other life events with loved ones and was deprived of the fundamental freedom to live one's life as an autonomous human being.

130. Tragically, while facing trial and unlawfully imprisoned, Lamotte's mental and physical health severely deteriorated.

131. Lamotte suffered injuries every day of his wrongful arrest and conviction.

132. He spent much of his time imprisoned housed in a psychiatric unit, where he was withdrawn, barely communicating with others, eating little, and not participating meaningfully in daily activities.

133. He did not receive adequate mental health treatment while incarcerated, which led to his continued suffering. Today, he is a shell of the young man he was before the malicious prosecution. He refuses to leave his home, in part, due to his fear of again being falsely accused.

134. Lamotte also suffered physical injuries during his incarceration. Those injuries included the lack of adequate medical care and nutrition, causing him to suffer daily.

135. Additionally, the emotion pain and suffering caused by his years unlawfully imprisoned has been substantial.

136. As a result of the foregoing, Lamotte has suffered tremendous damage, including but not limited to mental suffering leading to mental disease, physical injury, emotional damages, and the loss of a normal life, all proximately caused by Defendants' misconduct.

**Count I – 42 U.S.C. § 1983**
**Due Process**
**All Individual Defendants**

137. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

138. As described more fully above, Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Lamotte of his constitutional right to a fair trial.

139. In the manner described more fully above, the Defendants conducted a reckless investigation, withheld exculpatory evidence, withheld impeachment evidence, destroyed evidence, and fabricated false reports, false testimony, and other evidence. Absent this misconduct, Lamotte's prosecution could not and would not have been pursued.

140. Defendants' misconduct also directly resulted in Lamotte's unjust criminal conviction, thereby denying his constitutional right to a fair trial in violation of the Due Process of the Fourteenth Amendment to the United States Constitution.

141. As a result of the violation of his constitutional right to a fair trial, Lamotte suffered injuries, including not limited to, emotional distress and pain and suffering, as is more fully alleged above.

142. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Lamotte's constitutional rights.

143. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Frankfort Police Department.

**Count II – 42 U.S.C. § 1983**
**Deprivation of Liberty Without Probable Cause**
**Fourth and Fourteenth Amendments**
**All Individual Defendants**

144. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

145. As described more fully above, the Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Lamotte of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

146. In the manner described more fully above, the Defendants made, influenced and/or participated in the decision to prosecute Lamotte for assault in the first degree, a Class B felony carrying 10-20 years incarcerated, for which prosecution there was no probable cause and which caused Lamotte to suffer a deprivation of liberty. Their misconduct included falsifying and manipulating evidence and withholding exculpatory and impeachment evidence.

147. The Defendants' misconduct directly resulted in the unlawful prosecution and continued deprivation of Lamotte's liberty in violation of his constitutional rights.

148. As described more fully above, the prosecution was ultimately resolved in Lamotte's favor.

149. Because of this violation of his constitutional rights, Lamotte suffered injuries, including but not limited to emotional distress and bodily harm, as is more fully alleged above.

150. The Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Lamotte's constitutional rights.

151. The misconduct described in this Count was undertaken pursuant to a routine practice of the City of Frankfort to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence. In this way, the City Defendants violated Lamotte's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

152. These widespread practices, so well-settled so as to constitute *de facto* policy in the Frankfort Police Department, were able to exist and thrive because city policymakers with authority over these entities exhibited deliberate indifference to the problem, thereby effectively ratifying it.

153. The widespread practices described in the preceding paragraphs were allowed to flourish because the City Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

**Count III – 42 U.S.C. § 1983**
**Failure to Intervene**
**All Individual Defendants**

154. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

155. In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

156. Because of the Defendants' failure to intervene to prevent the violation of Lamotte's constitutional rights, Lamotte suffered pain and injury, as well as emotional distress.

157. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Lamotte's rights.

158. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Frankfort Police Department in the manner described more fully in preceding paragraphs and was tacitly ratified by policymakers for the City Defendants with final policymaking authority.

**Count IV - 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**
**All Individual Defendants**

159. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

160. After Sanders was assaulted, the Defendants reached an agreement amongst themselves to frame Lamotte for the crime and to thereby deprive him of his constitutional rights and liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

161. In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

162. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity, as described in this Complaint.

163. As a direct and proximate result of the illicit prior agreement referenced above, Lamotte's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

164. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

165. The misconduct described in this Count was undertaken pursuant to the policies and practices of the Frankfort Police Department in the manner described more fully in preceding paragraphs and was tacitly ratified by policymakers for the City Defendants with final policymaking authority.

**Count V - 42 U.S.C. § 1983**
**Equal Protection**
**All Individual Defendants**

166. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

167. As described more fully above, the Defendants denied Lamotte equal protection of law.

168. Specifically, these Defendants actively participated in or personally caused misconduct in terms of conducting criminal investigations and prosecutions in a manner calculated to deprive minority suspects of their due process rights by withholding material exculpatory evidence and fabricating false evidence of those suspects' guilt. Said misconduct was motivated by racial animus and constituted purposeful discrimination; it also affected minorities in a grossly disproportionate manner vis-à-vis similarly situated Caucasian individuals.

169. As a result of this violation, Lamotte, a Black male, suffered injuries, including but not limited to emotional distress.

170. The misconduct described in this Count was undertaken pursuant to the policies and practices of the Frankfort Police Department in the manner described more fully above.

**Count VI - 42 U.S.C. § 1983**
***Monell* Claim**
**Defendant City of Frankfort**

171. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

172. At all relevant times, and for a period before and after Lamotte's wrongful conviction, the City of Frankfort failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting interrogations and questioning criminal suspects; collecting, documenting, preserving, testing and disclosing evidence; writing police reports and taking investigative notes; obtaining statements and testimony from witnesses and victims; and maintaining and disclosing investigative files in criminal proceedings. Additionally, or alternatively,

the City of Frankfort failed to promulgate proper or adequate rules, regulations, policies, and procedures for training and supervising officers and agents of the Frankfort Police Department and the City of Frankfort, with respect to these subjects.

173. At all relevant times and for a period before and after Lamotte's wrongful conviction, the City of Frankfort had notice of a widespread practice and custom by officers and agents for the Frankfort Police Department under which individuals suspected of criminal activity, like Lamotte, were routinely deprived of their right to due process.

174. In addition, and at all relevant times and for a period before and after Lamotte's wrongful conviction, the City of Frankfort had notice of widespread practices by officers and agents of the Frankfort Police Department and City of Frankfort, including that officers: (1) did not record information in police reports, maintain proper investigative files, or disclose investigative materials to prosecutors and criminal defendants; (2) falsified witness statements and testimony; (3) fabricated false evidence implicating criminal defendants in criminal conduct; (4) failed to maintain or preserve exculpatory evidence or destroyed such evidence; and, (5) pursued wrongful convictions through profoundly flawed investigations.

175. These widespread practices, individually and together, were allowed to flourish because the City of Frankfort's leaders, supervisors, and policymakers directly encouraged, and were thereby the moving force behind, this very type of misconduct that occurred in Lamotte's case. They did this by failing to adequately

train and supervise their officers, agents, and employees on proper policing techniques and by failing to adequately punish and discipline past instances of similar misconduct, directly encouraging future abuses like those affecting Lamotte.

176. The actions of Frankfort Police Officers in fabricating false evidence and withholding material exculpatory information from Lamotte and his counsel were undertaken pursuant to the policies and practices of the Frankfort Police Department, which were created, maintained, or ratified by policymakers for the City of Frankfort with final policymaking authority.

177. The above policies, customs, and practices described in this Count, so well settled as to constitute *de facto* policies of the City of Frankfort, were able to exist and thrive, individually and together, because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

178. As a direct and proximate result of the City of Frankfort's actions, Lamotte's constitutional rights were violated, and he suffered injuries and damages, as set forth in this Complaint.

179. The City of Frankfort is therefore liable for the misconduct committed by its officers.

**Count VII – State Law Claim**
**Malicious Prosecution**
**All Individual Defendants**

180. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

181. Through their actions as described above, the Defendants caused Lamotte to be improperly subjected to a prosecution for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Lamotte's favor and in a manner indicative of his innocence.

182. The Defendant Officers accused Lamotte of criminal activities knowing those accusations to be without genuine probable cause; fabricated evidence and withheld the manner in which that evidence was fabricated; and made statements and reports to the police and/or prosecutors and/or Court with the intent of exerting influence to institute and continue the judicial proceedings.

183. The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendants within the scope of their employment and/or official responsibilities.

184. As a result of this misconduct, Lamotte suffered injuries, including the threat of bodily harm, and emotional pain and suffering as more fully alleged above.

**Count VIII – State Law Claim**
***Respondeat Superior***
**Defendant City of Frankfort**

185. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

186. In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Frankfort Police Department, acting at all relevant times within the scope of their employment.

187. Defendant City of Frankfort is liable as principal for all state law torts committed by their agents.

**WHEREFORE**, Plaintiff, JOHN BRANDON LAMOTTE, respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF FRANKFORT, Frankfort Police Officers CHARLES WASHBURN, SCOTT MORGAN, RANDY CUMMINS, and JOSH BAKER, in their individual capacities; other unknown officers from the Frankfort Police Department; Franklin County Commonwealth's Attorney LARRY CLEVELAND, in his individual capacity, and FRANKLIN COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff, JOHN BRANDON LAMOTTE, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/Amy Robinson Staples
*One of Plaintiff's Attorneys*

LOEVY & LOEVY
*18 Village Plaza, PMB 181
Shelbyville, KY 40065
amy@loevy.com

**local address*

Michael Kanovitz
**Elliot Slosar

**Julia Quinn
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900

***a pro hac vice motion will soon be forthcoming*